Case No. 23-15465
**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

———————————————————————————

JOSEPH WILLIAMS,
*Plaintiff-Appellee*,


*vs.*


CITY OF SPARKS, et al.,
*Defendants-Appellants*.

———————————————————————————


Appeal from the United States District Court
For the District of Nevada
The Honorable Miranda M. Du
Case No. 3:22-cv-00197-MMD-CSD

———————————————————————————


**PLAINTIFF-APPELLEE'S ANSWERING BRIEF**

———————————————————————————


Law Offices of Dale K. Galipo
Dale K. Galipo (CA SBN 144074)
dalekgalipo@yahoo.com
Benjamin S. Levine (CA SBN 342060)
blevine@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
Tel.: (818) 347-3333
Fax: (818) 347-4118

Peter Goldstein Law Corp.
Peter Goldstein (NV SBN 6992)
peter@petergoldsteinlaw.com
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Tel.: (702) 474-6400
Fax: (888) 400-8799


*Attorneys for Plaintiff-Appellee*

Joseph Williams

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................... 1

STATEMENT OF JURISDICTION................................................................ 3

STANDARD OF REVIEW ............................................................................ 4

ISSUES PRESENTED................................................................................... 5

STATEMENT OF THE CASE....................................................................... 6

    I.      Pertinent Procedural History ....................................................... 6

    II.    Statement of Facts ....................................................................... 6

SUMMARY OF ARGUMENT ..................................................................... 15

ARGUMENT ............................................................................................... 16

    I.      This Court Lacks Jurisdiction over this Appeal ....................... 16

    II.    Even if this Court Had Jurisdiction, the Officers Would Not Be Entitled to Qualified Immunity ................................................ 25

        A.    The Shooting Was Excessive and Unreasonable........... 26

            1.    The Alleged Crimes at Issue Were Not Severe... 27

            2.    Williams Did Not Pose an Immediate Threat of Death or Serious Bodily Injury at the Time of the Shooting ........................................................... 28

            3.    Williams Was Not Fleeing or Resisting When Deadly Force Was Used ...................................... 35

            4.    The Officers Failed to Attempt to Use Other Feasible Alternatives Besides Deadly Force ....... 36

            5.    The Officers Failed to Warn Williams that They Would Use Deadly Force ................................... 36

            6.    The Officers Were Not Entitled to Use Deadly Force Based on the Prior Chase or the Possibility Williams Might Flee ........................................... 37

        B.    The Shooting Violated Clearly Established Law........... 40

        C.    The Officers' Use of 40mm Rounds Was Excessive, and Its Unconstitutionality Was Clearly Established ........... 54

CONCLUSION............................................................................................. 55

Form 8. Certificate of Compliance for Briefs............................................. 56

Cases

*A.D. v. Cal. Hwy. Patrol*,
712 F.3d 446 (9th Cir. 2013) ..................................................................46

*Acosta v. City and County of San Francisco*,
83 F.3d 1143 (9th Cir. 1996) ........................................... passim

*Adams v. Speers*,
473 F.3d 989 (9th Cir. 2007) .......................................... 18, 21, 46

*Alston v. Read*,
663 F.3d 1094 (9th Cir. 2011) .................................................................3

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..................................................................................4

*Armendariz v. Penman*,
75 F.3d 1311 (9th Cir. 1996) (en banc) .................................. 18, 21

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011)................................................................................40

*Behrens v. Pelletier*,
516 U.S. 299 (1996).................................................................................17

*Bias v. Moynihan*,
508 F.3d 1212 (9th Cir. 2007) ...............................................................24

*Branscum v. San Ramon Police Dep't*,
606 F. App'x 860 (9th Cir. 2015)...........................................................23

*Brosseau v. Haugen*,
543 U.S. 194 (2004)............................................................ 40, 41

*Bryan v. MacPherson*,
630 F.3d 805 (9th Cir. 2010) ............................................... 26, 36

*Carmen v. S.F. Unified Sch. Dist.*,
237 F.3d 1026 (9th Cir. 2001) ...............................................................24

*Crown Point Dev., Inc. v. City of Sun Valley*,
506 F.3d 851 (9th Cir. 2007) ..................................................................18

*Curnow ex rel. Curnow v. Ridgecrest Police*,
952 F.2d 321 (9th Cir. 1991) ..................................................................47

*Deorle v. Rutherford*,
272 F.3d 1272 (9th Cir. 2001) ........................................... 29, 36, 54

*Drummond ex rel. Drummond v. City of Anaheim*,
343 F.3d 1052 (9th Cir. 2003) ...............................................................48

*Earl v. Campbell*,
859 F. App'x 73 (9th Cir. 2021) .............................................................. 31, 34

*Eng v. Cooley*,
552 F.3d 1062 (9th Cir. 2009) .................................................................3

*Espinosa v. City & Cnty. of S.F.*,
598 F.3d 528 (9th Cir. 2010) .............................................................4, 26

*Estate of Anderson v. Marsh*,
985 F.3d 726 (9th Cir. 2021) ........................................................ passim

*Estate of Najera-Aguirre v. Cnty. of Riverside*,
29 F.4th 624 (9th Cir. 2022) ...................................... 28, 33, 35, 53

*Ford v. City of Yakima*,
706 F.3d 1188 (9th Cir. 2013) ...............................................................25

*Foster v. City of Indio*,
908 F.3d 1204 (9th Cir. 2018) .................................... 4, 17, 20, 21

*George v. Morris*,
736 F.3d 829 (9th Cir. 2013) ....................................... 3, 17, 18, 21

*Glenn v. Washington Cnty.*,
673 F.3d 864 (9th Cir. 2011) ......................................................... 26, 36

*Gonzalez v. City of Anaheim*,
747 F.3d 789 (9th Cir. 2014) ...............................................................25

*Graham v. Connor*,
490 U.S. 386 (1989)........................................................ 26, 28, 41

*Gray v. State*,
130 Nev. 1182, 2014 WL 4922871 (2014)............................................. 38, 39

*Holloway v. Horn*,
2021 WL 3929972 (9th Cir. Sept. 2, 2021)...................................................47

*Hope v. Pelzer*,
536 U.S. 730 (2002)........................................................................40

*Hughes v. Rodriguez*,
31 F.4th 1211 (9th Cir. 2022) ......................................................... 22, 23

*Jefferson v. Lias*,
21 F.4th 74 (3d Cir. 2021) ...............................................................46

*Johnson v. Jones*,
515 U.S. 304 (1995)........................................................ 3, 16, 17

*Karl v. City of Mountlake Terrace*,
678 F.3d 1062 (9th Cir. 2012) .............................................................3, 18

*Kennedy v. City of Ridgefield*,
    439 F.3d 1055 (9th Cir. 2006) ...................................................................17

*Kisela v. Hughes*,
    138 S. Ct. 1148 (2018) .............................................................................40

*Lam v. City of Los Banos*,
    976 F.3d 986 (9th Cir. 2020) ............................................................. 35, 47

*Lopez ex rel. Lopez v. Gelhaus*,
    871 F.3d 998 (9th Cir. 2017) ....................................................................25

*Lowry v. City of San Diego*,
    858 F.3d 1248 (9th Cir. 2017) (en banc) .................................................27

*Maddox v. City of Sandpoint*,
    732 F. App'x 609 (9th Cir. 2018) ....................................................... 18, 21

*Maropulos v. Cnty. of Los Angeles*,
    560 F.3d 974 (9th Cir. 2009) .................................................................3, 17

*Mattos v. Agorano*,
    661 F.3d 433 (9th Cir. 2011) (en banc) ..................................................28

*Mitchell v. Forsyth*,
    472 U.S. 511 (1985).....................................................................................3

*Monzon v. City of Murrieta*,
    978 F.3d 1150 (9th Cir. 2020) ..................................................................29

*Mullenix v. Luna*,
    577 U.S. 7 (2015)........................................................................................29

*Nehad v. Browder*,
    929 F.3d 1125 (9th Cir. 2019) ................................................. 26, 28, 33, 36

*Nelson v. City of Davis*,
    685 F.3d 867 (9th Cir. 2012) ....................................................................54

*NeSmith v. Olsen*,
    808 F. App'x 442 (9th Cir. 2020)........................................................ 18, 21

*Nieves v. Bartlett*,
    139 S. Ct. 1715 (2019)................................................................................25

*Orn v. City of Tacoma*,
    949 F.3d 1167 (9th Cir. 2020) ............................................................ passim

*Ortiz v. Jordan*,
    562 U.S. 180 (2011)................................................................................3, 17

*Ortiz v. Vizcarra*,
    773 F. App'x 450 (9th Cir. 2019)........................................................ 18, 21

iv

*Patterson v. City of Wildwood*,
354 F. App'x 695 (3d Cir. 2009) ...................................................23

*Plumhoff v. Rickard*,
572 U.S. 765 (2014) ............................ 34, 49, 50, 51, 52

*Porter v. Osborn*,
546 F.3d 1131 (9th Cir. 2008) ...................................33

*Prison Legal News v. Lehman*,
397 F.3d 692 (9th Cir. 2005) ...................................41

*Rivas-Villegas v. Cortesluna*,
595 U.S. 1 (2021) ...................................................41

*Roybal v. Toppenish Sch. Dist.*,
871 F.3d 927 (9th Cir. 2017) .....................................4

*Safari Club Int'l v. Haaland*,
31 F.4th 1157 (9th Cir. 2022) ...................................24

*Scott v. Harris*,
550 U.S. 372 (2007) ............................ 22, 23, 29

*Shannon v. Jones*,
812 F. App'x 501 (9th Cir. 2020) ...................... 18, 21

*Smith v. City of Hemet*,
394 F.3d 689 (9th Cir. 2005) ...................................36

*Soderberg v. City of Los Angeles*,
2020 WL 6540511 (C.D. Cal. Sept. 30, 2020) ...........................27

*Tabares v. City of Huntington Beach*,
988 F.3d 1119 (9th Cir. 2021) ...................................36

*Tennessee v. Garner*,
471 U.S. 1 (1985) ............................ passim

*Torres v. City of Madera*,
648 F.3d 1119 (9th Cir. 2011) ........................ 26, 33

*Vann v. City of Southhaven*,
876 F.3d 133 (5th Cir. 2017) ...................................46

*Vazquez v. County of Kern*,
949 F.3d 1153 (9th Cir. 2020) ...................................4, 48

*Villanueva v. California*,
986 F.3d 1158 (9th Cir. 2021) ........................ 47, 48, 52, 54

*Vos v. City of Newport Beach*,
892 F.3d 1024 (9th Cir. 2018) ...................................27

*Waterman v. Batton*,
393 F.3d 471 (4th Cir. 2005) ...........................................................46

*White v. Pauly*,
580 U.S. 73 (2017).............................................................................40

*Wilkinson v. Torres*,
610 F.3d 546 (9th Cir. 2010) ..................................................... 29, 52

*Williams v. Strickland*,
917 F.3d 763 (4th Cir. 2019) ...........................................................46

*Winkler v. City of Phoenix*,
849 F. App'x 664 (9th Cir. 2021).....................................................33

*Zion v. Cnty. of Orange*,
874 F.3d 1072 (9th Cir. 2017) .........................................................34

## Statutes

28 U.S.C. § 1291 .......................................................................................3

## Rules

Fed. R. App. P. 28(d). ...............................................................................1

Fed. R. App. P. 32.1(a)(i)........................................................................38

Fed. R. Civ. P. 56(c)(1)(A) .....................................................................24

Nev. R. App. P. 36(c)(2)-(3)....................................................................38

## <u>INTRODUCTION</u>

This civil rights action arises from the shooting of Joseph Williams ("Williams") by Officers Mateo Terrasas, Charles Colborn, Nathan Janning, Vernon Taylor, and Austin Gibson of the Sparks Police Department ("SPD"). Williams contends that the Officers[1] used excessive force when they fired at him a total of 30 times before firing two 40mm rounds. When the Officers shot without warning, Williams was in a pickup truck that was stationary and immobilized, having been pinned between two police vehicles with additional vehicles blocking the front and rear, and with a popped tire, such that it could not move in any direction and posed no immediate threat to anyone. On March 24, 2023, the district court denied Defendants' Motion for Summary Judgment as to Williams's Fourth Amendment, battery, and *Monell* claims. It determined that genuine disputes of material fact preclude qualified immunity as to the use of deadly force, including disputes regarding "whether Williams was capable of further flight and attempting to flee and drive off in Gibson's direction when [the Officers] opened fire seconds after Gibson, Janning, and Terrasas had pinned Williams's truck with their patrol vehicles." ER-014. Viewing the facts in the light favorable to Williams, the district court correctly held that the Officers were not entitled to qualified immunity for

---

[1] This brief refers to all Defendants-Appellants collectively as "Defendants" and to the Defendant-Appellant officers (*i.e.*, all Defendants except the City of Sparks) as "the Officers." *See* Fed. R. App. P. 28(d).

1

their use of deadly force. ER-017, 020. Because Defendants sought summary judgment as to the *Monell* claims only on the basis that there was no underlying constitutional violation, the district court properly denied summary judgment as to those claims for the same reasons. ER-021-22. The district court also properly ruled that the same genuine disputes of material fact preclude summary judgment on Williams's battery claim, to which the same standard applies. ER-022. Defendants filed an interlocutory appeal seeking reversal of these rulings.

This Court lacks jurisdiction over Defendants' appeal because Defendants failed to present all facts and reasonable inferences in the light most favorable to the nonmovant, Williams. Even if the Court had jurisdiction to decide the issue of qualified immunity on the merits, the district court correctly found disputed issues of material fact precluding summary judgment and qualified immunity for the Officers' use of deadly force. Viewing the evidence in the light most favorable to Williams, he posed no immediate threat of death or serious bodily injury — or of *any* injury — to anyone at the time of the shooting or after. The district court also correctly held that, viewing the facts in the light most favorable to Williams, it was clearly established at the time that the Officers' use of deadly force under the circumstances violated Williams's Fourth Amendment rights. Though the district court did not reach the issue, firing 40mm rounds at Williams after the shooting was also excessive, which likewise was clearly established at the time.

<u>**STATEMENT OF JURISDICTION**</u>

This Court lacks jurisdiction to decide Defendants' interlocutory appeal. *See Alston v. Read*, 663 F.3d 1094, 1098 (9th Cir. 2011) (pretrial order denying immunity is reviewable only to the extent it raises an issue of law); *Maropulos v. Cnty. of Los Angeles*, 560 F.3d 974, 975 (9th Cir. 2009) (per curiam) (citing *Johnson v. Jones*, 515 U.S. 304, 307 (1995)) (affirming denial of qualified immunity because district court's summary judgement order identifying genuine issue of fact for trial was not final, immediately appealable order). While this Court has jurisdiction over an interlocutory appeal based on the denial of qualified immunity under 28 U.S.C. § 1291, *see Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985), "[a]ny decision by the district court 'that the parties' evidence presents genuine issues of material fact is categorically unreviewable on interlocutory appeal,'" *George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013) (quoting *Eng v. Cooley*, 552 F.3d 1062, 1067 (9th Cir. 2009)); *see Ortiz v. Jordan*, 562 U.S. 180, 188 (2011). "Where there are disputed issues of material fact, [this Court's] review is limited to whether the defendant would be entitled to qualified immunity as a matter of law, assuming all factual disputes are resolved, and all reasonable inferences are drawn, in plaintiff's favor." *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1068 (9th Cir. 2012).

On appeal, Defendants rely on their version of the facts and draw inferences in their favor to argue that the district court erred in denying qualified immunity and merely raise a question of evidence sufficiency rather than a legal question this Court can review. *See Foster v. City of Indio*, 908 F.3d 1204, 1210 (9th Cir. 2018). Accordingly, and as explained more fully below, this Court lacks jurisdiction, and Defendants have waived their only permissible argument in this appeal: that even if the facts are viewed in Williams's favor, the law was not clearly established.

## STANDARD OF REVIEW

Denial of summary judgment based on qualified immunity is reviewed *de novo*. *See Roybal v. Toppenish Sch. Dist.*, 871 F.3d 927, 931 (9th Cir. 2017). Reviewing courts "must determine, viewing the evidence in the light most favorable to the nonmoving party and drawing all justifiable inferences in its favor, whether there are any genuine issues of material fact," *Vazquez v. County of Kern*, 949 F.3d 1153, 1159 (9th Cir. 2020), and "whether the district court correctly applied the substantive law," *Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 532 (9th Cir. 2010). Where disputed issues of material fact exist, summary judgment must be denied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see Espinosa*, 598 F.3d at 532.

4

## ISSUES PRESENTED

1.    Whether this Court lacks jurisdiction to consider this interlocutory appeal from an order denying qualified immunity based on genuinely disputed issues of material fact, where Defendants seek to relitigate those same factual disputes on appeal and do not merely argue an entitlement to qualified immunity when factual disputes are resolved, and all reasonable inferences are drawn, in Williams's favor.

2.    Whether the district court properly denied summary judgment as to Williams's Fourth Amendment, *Monell*, and battery claims where genuine disputes of fact preclude a determination that the Officers' use of deadly force against Williams, while Williams's truck was visibly immobilized and stationary, was reasonable.

3.    Whether the law was clearly established that using deadly force against an individual violates the Fourth Amendment where he is in is a stationary and immobilized vehicle, where no officer is in the vehicle's potential path were it able to move, and where all officers fired from positions to the side or rear of the vehicle, such that they faced no imminent threat of death or serious bodily injury.

4.    Whether the Officers are entitled to qualified immunity for firing 40mm rounds at Williams after the shooting, when he continued to pose no threat.

5

## STATEMENT OF THE CASE

### I.     Pertinent Procedural History

Williams filed this action in the United States District Court for the District of Nevada against the City of Sparks, Christopher Bare, Christopher Rowe, Mateo Terrasas, Charles Colborn, Nathan Janning, Vernon Taylor, and Austin Gibson on May 2, 2022. Defendants filed a partial motion to dismiss on July 26, 2022, and, before any discovery was taken, filed motions for summary judgment and to stay discovery on August 4, 2022. Williams timely opposed these motions. On September 8, 2022, the district court stayed discovery pending resolution of the summary judgment motion. On March 24, 2023, the district court entered an order denying Defendants' motion for summary judgment in part, denying the Officers' request for qualified immunity based on the presence of genuine disputes of material fact. ER-004-023. Defendants filed this interlocutory appeal. ER-081.

### II.    Statement of Facts

On May 5, 2020, a 911 call came in from a gas station reporting that a man stole beer and was vandalizing a vehicle. ER-048. When a 911 operator asked what the caller meant by "vandalizing," he explained that the man was "walking around the car." *Id.* The operator asked whether the man had a weapon, and the caller replied, "No." *Id.* Police dispatch sent out a message at 00:10:54 a.m., requesting an officer response for "larceny" regarding "a male that stole alcohol." ER-033.

6

Dispatch further advised that the suspect had no weapon. *Id.* When Williams — the suspect — began driving away, SPD Officers Taylor and Colborn followed him. *Id.* Colborn informed other officers via radio at 00:14:58 a.m. that "there [was] no pedestrian traffic and the speed [was] 30 [MPH]." ER-052 at 07:14:58Z. At 00:15:09 a.m., Colborn radioed that there was "no traffic" on the road. ER-034. Williams was panicking because officers were following him with lights and sirens. ER-025. At one point while Williams was driving, Williams's car backfired. *Id.* Colborn saw and heard the sound and radioed that Williams's truck "backfired." ER-052 at 07:15:24Z-07:15:26Z. At 00:15:53-56, Colborn radioed that Williams was "yielding at the red light." *Id.* at 07:15:53Z-07:15:56Z.

Colborn then advised that Williams was going 8 MPH eastbound on Glendale Avenue at 00:16:30 a.m. ER-034 at 2. At 00:18:19 a.m., Colborn updated that Williams's speed was 35 MPH. *Id.* When Williams's vehicle stopped outside a fenced-in industrial area, officers directed Williams to show them his hands, and Williams placed both hands and his head out of the driver's side window and kept his hands there. ER-052 at 07:18:35Z-07:18:39Z. Williams tried to talk to the officers, saying, "I just want you to come and talk." *Id.* 07:19:01Z-07:19:03Z. Williams tried to talk to the officers, keeping his head and hands out of the window. *Id.* at 07:19:28-35Z, 07:20:26Z-07:20:28Z, 07:20:39Z, 07:20:57Z. Williams told officers he was "afraid" and that he wanted to explain things. *Id.* at

7

07:25:52Z -07:27:51Z. When officers declined to approach, he panicked again and resumed driving. *Id.* at 07:29:09Z.

After Williams left the industrial area, at 00:35:06 a.m. Colborn updated that Williams was driving at 35 MPH and there was "no traffic." ER-035 at 3. Williams went onto the freeway and, at 00:37:01 a.m., Colborn radioed that Williams was going 65 MPH and there was "no traffic" on the freeway. ER-035. According to the dispatch log, the fastest speed Williams reached was 66 MPH, at 00:37:22 a.m., while on the freeway past midnight with no traffic. *Id.* At 00:49:04 a.m., dispatch informed the officers that spike strips used to deflate Williams's tires were effective. ER-036. At 00:50:31 a.m., Colborn radioed that the front passenger tire was deflating before advising that Williams's vehicle was slowing down. *Id.* At 00:51:52 a.m., dispatch advised officers that a second spike strip was ready at an upcoming exit. *Id.* At 00:52:50 a.m., a supervising officer radioed an order to "make sure that … when [Williams] stops, use less lethal." ER-052 at 07:52:50-54Z. At 00:53:18 a.m., Colborn radioed that William's speed was 35 MPH. ER-036.

Bare ordered Colborn, "Don't follow him. Do not follow him." when Williams's truck turned left, but Colborn nevertheless kept his vehicle at the rear of the truck as Williams turned across the median onto the eastbound side of the freeway. ER-066 at 07:54:28Z-07:54:30Z. Williams crossed the freeway but did

not travel in the wrong direction. *Id.*; ER-053 at 07:54:23Z-07:54:35Z. There was no traffic on the freeway except a semi-truck, which was travelling on the westbound side, far from Williams's and the officers' vehicles. ER-053 at 07:54:31-07:54:32Z. Although the rear of Williams's vehicle bumped Colborn's vehicle, *id.* at 07:54:45Z-49Z, Williams never attempted to "ram" Colborn's vehicle or any other police vehicle, ER-025.

An officer executed a PIT maneuver on Williams's truck, causing it to spin toward a dirt median area. ER-025; ER-066 at 07:55:54Z-07:56:00Z. Williams attempted to regain control of his truck so it would not collide with any of the police vehicles. ER-025. He also visibly attempted to avoid the police vehicles that were in the truck's path by trying to maneuver around them and did not intentionally bump into any vehicle. ER-025; ER-066 at 7:56:02Z-7:56:03Z.

When Williams's truck then came to a stop, Janning rammed his vehicle into the driver's side of the truck and accelerated, pushing Williams's truck into Terrasas's vehicle, and thereby pinning the truck between Janning's and Terrasas's vehicles. ER-057 at 07:56:07Z-07:56:13Z; ER-061 at 07:56:11Z-12Z; ER-025. Because of the force from Janning's vehicle, the front of Janning's vehicle became wedged underneath the driver's side of Williams's truck, lifting the entire driver's side of the truck — including both wheels — approximately one foot off the ground. ER-071 at 07:56:11Z-07:56:16Z; ER-057 at 07:56:09Z-07:56:13Z. By this

point, because Williams's truck was pinned in place between the two police vehicles and half of it was raised off the ground, it was incapacitated and unable to move in any direction. ER-071 at 07:56:11Z-07:56:16Z; ER-057 at 07:56:07Z-07:56:13Z; ER-061 at 07:56:11Z-12Z; ER-025. The truck's engine began to make noise, but the truck did not move. ER-053 at 07:56:09Z; ER-057 at 07:56:10Z; ER-061 at 07:56:12Z; ER-071 at 07:56:10-13Z. Williams saw the Officers pointing their guns at him, and he tried to lower his body in the truck. ER-025.

From a position forward and to the left of the truck, Gibson then drove his own patrol vehicle forward, stopping when the front of his vehicle was approximately 2-3 feet in front of the left portion of the truck's front bumper — further blocking the front of Williams's truck — with the rear of his vehicle angled away from the truck. ER-071 at 07:56:9Z-7:56:14Z. By then, the truck was already stationary and pinned between Janning's and Terrasas's vehicles. *Id*. at 07:56:11-12Z; ER-025. Colborn also parked his vehicle directly behind the truck, facing away, such that the rear of Colborn's vehicle also appears to have been blocking the truck from behind. ER-052 at 07:56:07Z-07:57:32Z.

Gibson yelled, "Stop the car," which was already stopped, while getting out of his vehicle. ER-071 at 7:56:15Z-16Z; ER-072 at 7:56:12Z. Upon exiting, Gibson immediately moved back, around the rear of his vehicle to its passenger side, while beginning to fire at Williams from a position to Williams's left, without

giving any warning. ER-072 at 07:56:12Z-18Z. Terrasas got out of his vehicle immediately after Williams's truck became pinned against it, and within two seconds, Terrasas began shooting at Williams from a position behind and to the right of the truck without giving any warning. ER-062 at 07:56:10Z-26Z. When Williams's truck was already pinned between the two police vehicles, Colborn exited his own vehicle and without giving any warning began shooting at the truck from a position behind and to the right of the truck. ER-052 at 07:56:09Z-20Z. Around the same time, Taylor exited his vehicle and without saying anything began shooting at the truck from a position to the right of the truck, with two police vehicles between him and the truck. ER-076 at 07:56:12Z-07:57:45Z. Williams's truck was stopped for approximately 3-4 seconds before the shots began and remained stopped and stationary for the remainder of the encounter, including during all the shots. ER-071 at 07:56:11Z-27Z; ER-072 at 07:56:12Z-07:56:40Z; ER-052 at 07:56:11Z-27Z; ER-057 at 07:56:08Z-27Z; ER-062 at 07:56:10Z-26Z; ER-025.

After Williams's truck was stopped and pinned between Janning's and Terrasas's vehicles, Williams never attempted to flee. ER-025-026. Williams never verbally threatened to harm any person or officer. *See* ER-052-076. Williams did not pose an immediate threat of death or serious bodily injury to any person or officer immediately before or during the shooting, as his truck was stationary,

11

partially lifted off the ground, and immobilized. ER-057 at 07:56:07Z-12Z; ER-071 at 07:56:11Z-27Z; ER-072 at 07:56:12Z-40Z. Williams's truck was never moving in the direction of any police officer immediately before the shots or after the shots began. ER-071 at 07:56:11Z-07:59:00Z; ER-072 at 07:56:12Z-07:56:57Z; ER-052 at 07:56:11Z-07:57:03Z; ER-062 at 07:56:10Z-07:56:30Z; ER-025-026. No officer was in the truck's potential path immediately before or during any of the shots, and Williams could not see any officer in front of the truck at any time after the truck stopped and before the shooting ceased. ER-072 at 07:56:12Z-18Z; ER-025. Williams was also not sitting in an upright position in the driver's seat during the time the shots were fired and therefore was not in a position to operate the truck or attempt to flee, even had the truck not been immobilized. ER-071 at 07:56:13Z-40Z.

After the shooting, Officers intentionally fired two 40mm rounds through the truck's rear window, into the cab. ER-067 at 08:00:55Z-08:01:46Z, 08:03:30Z-08:05:15Z; ER-061 at 08:04:33Z-08:05:15Z. Williams loudly objected before they were fired and cried out as at least one round struck him. ER-061 at 08:04:42Z-08:05:23Z.

The Officers shot at Williams approximately 30 times over the course of 14 seconds before firing 40mm rounds at him; as a result, Williams sustained serious injuries. ER-053 at 07:56:13Z-07:56:27Z; ER-057 at 07:56:13Z-7:56:26Z; ER-061

at 7:56:14Z-07:56:28Z; ER-071 at 07:56:16Z-07:56:29Z. The final three gunshots were preceded by a pause. ER-057 at 07:56:23Z-26Z; ER-061 at 07:45:25Z-28Z; ER-072 at 07:56:23Z-26Z. The truck remained in its stationary, pinned-in position while making noise from approximately 3-4 seconds prior to the shooting until approximately 51 seconds after. ER-057 at 07:56:10Z-07:57:17; ER-071 at 07:56:12Z-07:57:05. When Colborn and another officer cut off Williams's sweatshirt and shirt after the shooting, officers could see gunshot wounds to Williams's body, including his forehead, chest, arm, and the back of his neck, and a bruise on his shoulder. ER-052 at 08:12:19Z-08:13:18Z; ER-080 at 8:13:58Z.

Police practices expert Roger A. Clark submitted a declaration stating that nationally accepted police standards and training at the time of this incident were as follows:

(1) Officers are trained that deadly force can only be used as a last resort. SER-32;

(2) Officers are trained that, in consideration of the sanctity of life, deadly force is only authorized absent obvious reasonable alternatives. SER-32;

(3) Officers are trained that deadly force can only be used in defense of immediate threat of death or serious bodily injury. SER-32;

(4) Officers are trained that deadly force is only justified by an "objectively reasonable" belief that the suspect poses an immediate threat of death or serious bodily injury, meaning subjective fear is not enough. SER-33;

(5) Officers are trained that they must show reverence for human life. SER-33;

(6) Officers are trained that they must justify every shot they fire. SER-33;

(7) Officers are trained to give a verbal warning that they will shoot before using deadly force, when feasible. SER-33;

(8) Officers are trained that deadly force should never be used against a moving vehicle unless there is an individual about to be run over and there is no opportunity to get out of the way. SER-33;

(9) Officers are trained not to stand in the path of a vehicle they think might move. SER-33;

(10) Officers are trained that if a vehicle is moving and appears to be coming in their direction, they should get out of the vehicle's path instead of discharging a firearm at it or its occupant(s), allow the vehicle to pass, and utilize other means to apprehend the suspect. SER-33;

(11) Officers are trained that if they are not in a vehicle's path, they should not shoot at the vehicle or its driver in defense of their own life because there is no immediate threat of death or serious bodily injury. SER-34;

14

(12) Officers are trained that they cannot justify shooting at a vehicle with an engine on, or even at a moving vehicle, simply because the driver is trying to flee. SER-34.

Clark also opined that, based on the video evidence, the shooting officers violated their training when they started firing at Williams's stopped truck, which was pinned between two police vehicles and stationary, when no one was in the truck's direct path. SER-34. Clark also opined that reasonable alternatives in this case included keeping the truck where it was, as the truck was pinned in and stationary, and waiting for Williams to exit. SER-34.

## SUMMARY OF ARGUMENT

This Court should dismiss this interlocutory appeal for lack of jurisdiction. Defendants improperly argue that, based on their preferred version of the facts and interpretation of the video evidence — which the district court rejected based on its own review of the evidence — and with inferences taken in their favor, qualified immunity should be granted. Defendants present the facts in the light most favorable to themselves and, based on that presentation, argue that all 30 shots the Officers fired at Williams were reasonable and, further, that Williams's right to be free from deadly force was not clearly established — an argument Defendants have waived.

If the Court should reach the merits of this appeal, it should affirm the district court's denial of qualified immunity to the Officers. When viewing the facts and drawing all reasonable inferences in Williams's favor, the Officers' hail of gunfire against Williams, who was in a vehicle that was physically incapacitated and stationary, such that he posed no imminent threat of harm to anyone, and who was otherwise unarmed and had not injured or attempted to injure anyone, without issuing any warning despite having opportunities to do so, was unreasonable. The number of shots was also excessive, and during the 14-second period in which the Officers fired, the Officers had numerous opportunities to reevaluate but failed to stop shooting. The state of the law was also sufficiently clear at the time to provide the Officers with fair notice that firing a total of 30 shots against a suspect who posed no immediate threat of death or serious bodily injury, then firing 40mm rounds at that nonthreatening suspect, would each violate the Constitution.

## ARGUMENT

### I.  This Court Lacks Jurisdiction over this Appeal

"[A]ny 'portion of a district court's summary judgment order that, though entered in a 'qualified immunity' case, determines only a question of 'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial . . . is not appealable.'" *Estate of Anderson v. Marsh*, 985 F.3d 726, 730-31 (9th Cir. 2021) (quoting *Johnson*, 515 U.S. at 313). Thus, "instant appeal is not available . . .

16

when the district court determines that factual issues genuinely in dispute preclude summary adjudication." *Ortiz*, 562 U.S. at 188; *see Behrens v. Pelletier*, 516 U.S. 299, 308 (1996) (same); *Estate of Anderson*, 985 F.3d at 728 (finding no jurisdiction where appellant "challenges only the district court's conclusion that there is sufficient evidence to create a genuine dispute as to the factual question that will determine whether [the] use of force was reasonable"); *Foster*, 908 F.3d at 1210 ("A public official may not immediately appeal 'a *fact*-related dispute about the pretrial record, namely, whether or not the evidence in the pretrial record was sufficient to show a genuine issue of fact for trial.'") (quoting *Johnson*, 515 U.S. at 307); *George*, 736 F.3d at 834 (in qualified immunity context, "any decision by the district court that the parties' evidence presents genuine issues of material fact is categorically unreviewable on interlocutory appeal") (cleaned up); *Maropulos*, 560 F.3d at 975; *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1060 (9th Cir. 2006).

Because a district court's denial of qualified immunity at the summary judgment stage based on genuine disputes of material fact is not immediately appealable, this Court may exercise jurisdiction only "[t]o the extent the district court's order denies summary judgment on purely legal issues." *Foster*, 908 F.3d at 1210; *see George*, 736 F.3d at 836 ("[W]e are confined to the question of whether the defendant would be entitled to qualified immunity as a matter of law, assuming all factual disputes are resolved, and all reasonable inferences are drawn, in

17

plaintiff's favor.") (cleaned up); *Karl*, 678 F.3d at 1068. Thus, where an interlocutory appeal challenges a qualified immunity denial based only on the sufficiency of the evidence, the appeal must be dismissed. *Estate of Anderson*, 985 F.3d at 728; *see Armendariz v. Penman*, 75 F.3d 1311, 1316 (9th Cir. 1996) (en banc), *overruled in part on other grounds as recognized in Crown Point Dev., Inc. v. City of Sun Valley*, 506 F.3d 851, 852 (9th Cir. 2007); *Shannon v. Jones*, 812 F. App'x 501, 502-03 (9th Cir. 2020). Moreover, on interlocutory appeal, failure to present the facts in the light most favorable to the plaintiff-appellee constitutes waiver of an appellant's only permissible argument: that based on *those* facts, the appellant is entitled to summary judgment. *NeSmith v. Olsen*, 808 F. App'x 442, 444 (9th Cir. 2020); *Maddox v. City of Sandpoint*, 732 F. App'x 609, 610 (9th Cir. 2018); *see George*, 736 F.3d at 837; *Ortiz v. Vizcarra*, 773 F. App'x 450, 451 (9th Cir. 2019). "The exception to the normal rule prohibiting an appeal before a trial works only if the appellant concedes the facts and seeks judgment on the law." *Adams v. Speers*, 473 F.3d 989, 991 (9th Cir. 2007).

Here, the district court found that the issue of "whether Williams posed an immediate safety threat to the Officers and to others" at the time of the shooting is genuinely disputed because "the parties dispute whether Williams was capable of further flight and attempting to flee and drive off in Gibson's direction when the Officers opened fire, just a few seconds after Gibson, Janning, and Terrasas had

pinned Williams's truck with their patrol vehicles." ER-014. It reached this conclusion based on its review of the evidence and determination that, "[c]ontrary to Defendants' version of events, the Officers' body cam and dash cam recordings do not clearly show that Williams was either turning or attempting to accelerate in Gibson's direction, . . . or even moving the truck at all." ER-015. It further found that, critically, "Gibson's body cam footage shows that he opened fire while walking behind and toward the back of his patrol vehicle, away from the front of Williams's truck" — *i.e.*, away from the alleged threat. ER-015-016. It also concluded that other factors relevant to the reasonableness of the force used — whether "(1) the underlying offenses . . . were sufficiently 'severe,' (2) the Officers' orders to stop the car and put hands up as they opened fire constituted proper warnings, and (3) the Officers reasonably and genuinely did not know that Williams was no longer a flight risk when they began shooting" — "are reasonably disputed" based on the evidence. ER-017.

The district court made crystal clear that its denial of qualified immunity was due to the existence of these genuine disputes of material fact:

> These key facts remain in dispute, and it is possible the rational factfinder will determine that Williams did in fact threaten the Officers, that their decision to shoot him was justified, and that would compel this Court to find that qualified immunity attaches. But the rational factfinder could reasonably reach a contrary conclusion. Accordingly, Defendants are not entitled to summary judgment on their qualified immunity defense . . . .

ER-020. Accordingly, the district court's order would be immediately appealable only if Defendants argued that, even viewing all facts in Williams's favor (as the district court did), Williams's Fourth Amendment right was still not clearly established under qualified immunity's second prong. *See Estate of Anderson*, 985 F.3d at 728, 730-31; *Foster*, 908 F.3d at 1210.

In their opening brief, however, Defendants press the exact same version of the facts, with numerous inferences drawn in their favor, that the district court rejected. *Compare* Motion, SER-5-11, *with* AOB at 10-21 (presenting same factual recitation). In addressing the key issue of whether Williams posed a threat to the Officers at any time when the Officers fired, Defendants claim that Williams "tried to drive into Officer Gibson's vehicle and towards Officer Gibson when he was outside the vehicle" immediately before the shooting, and further that Williams "continued to attempt to drive his truck over Officer Gibson's vehicle and towards officers even after the officers shot at him." AOB at 33; *see id.* at 17, 38 (same). But as noted, the district court rejected these precise factual contentions on the basis that the evidence created a genuine dispute as to whether the asserted underlying facts are true. *See* ER-014-016. Defendants also again regurgitate their version of the facts in arguing other factors bearing on the reasonableness of force — the severity of Williams's alleged crimes and whether Williams was attempting

to flee — which the district court likewise found were disputed. AOB at 33-34; *see* ER-017.

Because Defendants' appeal therefore challenges the sufficiency of the evidence, rather than whether the Officers would be entitled to qualified immunity when the facts are viewed the light most favorable to Williams, this Court lacks jurisdiction over this interlocutory appeal. *Adams*, 473 F.3d at 991; *see Estate of Anderson*, 985 F.3d at 728; *Foster*, 908 F.3d at 1210. Accordingly, this appeal should be dismissed. *See Estate of Anderson*, 985 F.3d at 728; *Armendariz*, 75 F.3d at 1316; *Shannon*, 812 F. App'x at 502-03. Moreover, because Defendants improperly argue that the Officers are entitled to qualified immunity based on Defendants' version of the facts and with inferences drawn in Defendants' favor, Defendants have waived any argument that the law at issue was not clearly established under qualified immunity's second prong. *See George*, 736 F.3d at 837; *NeSmith*, 808 F. App'x at 444; *Maddox*, 732 F. App'x at 610; *Ortiz*, 773 F. App'x at 451.

Defendants attempt to circumvent this dispositive issue by framing their challenge to the district court's determination that factual disputes preclude summary judgment as being based on the district court's alleged failure to view the facts as depicted in the video evidence, claiming that the district court instead merely "adopted Plaintiff's version of the facts." AOB at 7-8; *see id* at 9. This

Court has "recognized that . . . *Scott v. Harris*, 550 U.S. 372 (2007), created a narrow additional avenue for a defendant to argue that a plaintiff's version of the facts is 'blatantly contradicted by the record, so that no reasonable jury could believe it.'" *Estate of Anderson*, 985 F.3d at 731 n.3 (quoting *Orn v. City of Tacoma*, 949 F.3d 1167, 1171 (9th Cir. 2020)).[2] Accordingly, if the district court had uncritically adopted Williams's version of the facts, as Defendants suggest, AOB at 7-9, then this Court could exercise jurisdiction by "rejecti[ng] [ ] the plaintiff's factual allegations by noting that a videotape of the events in question quite clearly contradicted the version of the story told by the plaintiff." *Id.* (cleaned up).

The district court, however, explicitly considered Defendants' video evidence in determining that genuine disputes of material fact preclude summary judgment, and its order clearly identified the numerous video clips upon which it relied. ER-015; *see also* ER-005-011 (relying nearly exclusively on video evidence in describing factual background). As the district court explained:

> Contrary to Defendants' version of events, the Officers' body cam and dash cam recordings do not clearly show that Williams was either turning or attempting to accelerate in Gibson's direction, spinning his

[2] Specifically, "a district court may properly view the facts in the light depicted by bodycam footage and its accompanying audio, to the extent the footage and audio *blatantly* contradict testimonial evidence." *Hughes v. Rodriguez*, 31 F.4th 1211, 1218 (9th Cir. 2022). Where a fact advanced by the non-moving party is not "blatantly contradicted," it must be viewed in the light most favorable to him. *See id.* at 1219.

tires, or even moving the truck at all. In looking at the relevant recordings during the seconds before the shooting, the Court does not see what Defendants claim occurred, *i.e.*, Williams trying to accelerate and attempting to flee in Gibson's direction. Indeed, the thick cloud that formed during these crucial few seconds further affects the visibility such that one cannot clearly see what actually transpired. Moreover, Gibson's body cam footage shows that he opened fire while walking behind and toward the back of his patrol vehicle, away from the front of Williams's truck.

ER-015-016 (citations omitted); *see also Branscum v. San Ramon Police Dep't*, 606 F. App'x 860, 862 (9th Cir. 2015) (determining *Scott* did not apply where "the video footage [wa]s, as the district court determined, susceptible to more than one interpretation"); *Patterson v. City of Wildwood*, 354 F. App'x 695, 698 & n.2 (3d Cir. 2009) (identifying and applying same principle, and collecting cases). Accordingly, Defendants' assertion that "even though the entire events were captured on multiple dash cameras and body worn cameras, the district court ignored the videos and instead claimed that there were genuine issues of material fact based on the subjective intention of the Plaintiff," AOB at 7, is false. Because, contrary to Defendants' assertions, the district court *did* "view[ ] the facts in the light depicted in the videotape," AOB at 8 (quoting *Hughes v. Rodriguez*, 31 F.4th 1211, 1218 (9th Cir. 2022)),[3] *Scott v. Harris* does not provide an alternative avenue

---

[3] In support of their claim that the district court failed to view the evidence in the light depicted by the video evidence, Defendants point to a portion of Janning's dash cam footage taken after the shooting, which they claim shows one of Williams's truck's rear wheels stop spinning, which Defendants contend shows the

by which this Court may obtain jurisdiction in this case. *See Estate of Anderson*,

985 F.3d at 731 n.3.[4]

---

truck's wheels must have been spinning when the shots were fired. AOB at 36 n.11. However, Defendants <u>never identified this portion of the video in their motion for summary judgment</u>. *See* Motion, SER-3-30. Defendants therefore forfeited this argument below, then waived it by failing to argue plain error here.

"A district court does not have a duty to search for evidence that would create a factual dispute." *Bias v. Moynihan*, 508 F.3d 1212, 1219 (9th Cir. 2007) (citing *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001)). It is only required to consider the "particular parts of materials in the record" to which a party has cited, Fed. R. Civ. P. 56(c)(1)(A); *see id.*, advisory committee's note to 2010 amendment ("Subdivision (c)(1)(A) . . . requires that the movant cite the particular parts of the materials that support its fact positions."), and "the court may decide a motion for summary judgment without undertaking an independent search of the record," *id.* Here, the district court found this detail was disputed, based on its review of the video evidence Defendants did cite. ER-015-016. Defendants cannot now argue that the district court failed to view the facts in the light depicted in video evidence when Defendants never identified for the district court the footage they now claim the district court was supposed to consider. *See Carmen*, 237 F.3d at 1031; *cf. Safari Club Int'l v. Haaland*, 31 F.4th 1157, 1176-77 (9th Cir. 2022). In any event, the portion of the video Defendants now identify does not clearly show whether the rear wheel was spinning, in part due to "the thick cloud" of dust that still obscured the video, ER015, and it does not depict any of the other wheels. Thus, even if this argument could be considered on appeal, this fact would remain disputed.

[4] Because Defendants' only argument that appellate jurisdiction exists over their interlocutory appeal of the denial of summary judgment as to Williams's *Monell* and battery claims is that those claims are derivative of or mirror Williams's Fourth Amendment claim, this Court also lacks jurisdiction to review those aspects of the district court's order on interlocutory appeal.

**II.    Even if this Court Had Jurisdiction, the Officers Would Not Be Entitled to Qualified Immunity**

An officer is not entitled to qualified immunity where the "(1) facts viewed in the light most favorable to the injured party show that the officer violated a constitutional right and (2) the right was clearly established at the time of the alleged misconduct." *Ford v. City of Yakima*, 706 F.3d 1188, 1192 (9th Cir. 2013) (citation omitted), *abrogated on other grounds by Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019).

As discussed above, on an interlocutory appeal of a denial of qualified immunity at summary judgment, all factual disputes must be resolved, and all reasonable inferences therefrom must be drawn, in the non-movant's favor — a requirement the Officers resisted below and continue to resist on appeal. *See supra* Argument I. The Ninth Circuit has "held that 'summary judgment should be granted sparingly in excessive force cases.'" *Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017) (quoting *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (en banc)). Here, when all factual disputes are resolved and all reasonable inferences drawn in Williams's favor, it is plain that (1) the officers' use of deadly force against Williams was excessive and unreasonable, and (2) Williams's Fourth Amendment right to be free from deadly force under these circumstances was clearly established at the time of the incident.

### A. The Shooting Was Excessive and Unreasonable

In excessive force claims under the Fourth Amendment, courts evaluate whether officers' actions were "objectively reasonable" considering the facts and circumstances confronting them. *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)); *Espinosa*, 598 F.3d at 537 (citing *Scott*, 550 U.S. at 381). "This inquiry requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interest at stake." *Glenn*, 673 F.3d at 871 (quoting *Graham*, 490 U.S. at 396). Courts must "balance the amount of force applied against the need for that force." *Bryan v. MacPherson*, 630 F.3d 805, 823-24 (9th Cir. 2010). Governmental interests to balance against the amount of force used include "[(1)] the severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Additional factors include (4) whether a warning was given that failure to comply with the officer's commands would result in use of deadly force and (5) whether the officer had other alternative methods to take the subject into custody or subdue him. *Nehad v. Browder*, 929 F.3d 1125, 1137, 1138 (9th Cir. 2019). The inquiry is "highly fact-intensive" and involves "no *per se* rules." *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011). "Not

all errors in perception or judgment . . . are reasonable," and while courts "do not judge the reasonableness of an officer's actions 'with the 20/20 vision of hindsight,' nor does the Constitution forgive an officer's every mistake." *Id.*

### 1. The Alleged Crimes at Issue Were Not Severe

In the Ninth Circuit, the "severity of the crime" factor relates only to the *initial crime* prompting a response by police, rather than to any alleged crimes officers identify thereafter. *See Vos v. City of Newport Beach*, 892 F.3d 1024, 1031 & n.6 (9th Cir. 2018) (analyzing severity factor based on fact that officers were responding to reported "erratic behavior," not to any reported crime, even though officers identified potential crimes upon arrival); *Soderberg v. City of Los Angeles*, 2020 WL 6540511, at *9 n.11 (C.D. Cal. Sept. 30, 2020) (identifying this rule, and considering only crime of "hot prowl" to which officers initially responded, despite suspect's subsequent resistance and flight from officers) (citing *Lowry v. City of San Diego*, 858 F.3d 1248, 1257-58 (9th Cir. 2017) (en banc)). Here, the initial alleged crimes to which the officers responded were theft of beer and vandalism, not dangerous or serious crimes.

Moreover, even were the Court to consider Williams's subsequent alleged offenses, viewing the facts in Williams's favor, a reasonable jury could find that he was not driving in a manner that posed danger to officers or the public during the pursuit. The fastest Williams ever traveled was approximately 66 MPH while on

the freeway, and much of the pursuit occurred at far slower speeds. The pursuit occurred after midnight and there was "no traffic" or other vehicles on the road for nearly the entire pursuit. After Williams's truck ran over spike strips, it slowed to approximately 35 MPH. The only other non-police vehicle ever visible during the pursuit was a semi-truck, which was a significant distance *behind* Williams, traveled in the same direction as Williams and the officers, and was not in danger of being struck when Williams's truck turned across the median to go eastbound on the freeway. Accordingly, even if the Court were to consider alleged crimes other than those reported in the initial call, the "severity" factor weighs in Williams's favor and against the use of deadly force.

### 2. Williams Did Not Pose an Immediate Threat of Death or Serious Bodily Injury at the Time of the Shooting

"The most important *Graham* factor is whether the suspect posed an immediate threat to anyone's safety." *Nehad*, 929 F.3d at 1132 (citing *Mattos v. Agorano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc)). "The intrusiveness of a seizure by means of deadly force is unmatched." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). Thus, use of deadly force is unreasonable "where the suspect poses no immediate threat to the officer" or to others. *Estate of Najera-Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 629 (9th Cir. 2022) (quoting *Garner*, 471 U.S. 11). "[A] simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be *objective* factors to justify such a concern." *Deorle v.*

*Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001) (emphasis added). An officer's "desire to resolve quickly a potentially dangerous situation" does not, on its own, justify the use of deadly force. *Id.* Basic police training teaches that deadly force can only be used in an immediate defense of life situation, as a last resort in the direst of circumstances, and when no other reasonable options are available.

"A moving vehicle can of course pose a threat of serious physical harm, but only if someone is at risk of being struck by it." *Orn*, 949 F.3d at 1174. Thus, officers' use of deadly force to stop a reckless, dangerous speeding vehicle *during* a high-speed pursuit has been deemed reasonable under the Fourth Amendment. *See, e.g.*, *Mullenix v. Luna*, 577 U.S. 7, 15 (2015); *Scott*, 550 U.S. at 386. However, the Ninth Circuit has found the use of deadly force against a *stopped* vehicle reasonable only when the vehicle makes an overt, aggressive action to continue fleeing and is still capable of flight. *See Monzon v. City of Murrieta*, 978 F.3d 1150, 1155, 1161 (9th Cir. 2020) (finding use of deadly force reasonable where suspect, who had led officers on high-speed chase approaching 100 MPH, had, just before officers fired, accelerated to over 17 MPH before crashing into patrol vehicle, causing officer's arm to go through window and injuring officer, and where vehicle was still accelerating and capable of moving toward officers at time of shots); *Wilkinson v. Torres*, 610 F.3d 546, 551-53 (9th Cir. 2010) (finding use of deadly force reasonable where officers were in slippery yard in close

proximity to minivan that was accelerating toward them and was unobstructed by anything in its path).

Here, during the full 17 seconds from the time the truck stopped to the time the final shot was fired, no one was at risk of being struck by Williams's truck, which was visibly immobilized for this entire period. Before officers executed the PIT maneuver, one of the truck's tires was already popped. Approximately 3-4 seconds before the shots began, the truck had come to a complete stop. One second after the truck stopped, Janning rammed his vehicle into the driver's side of the truck, wedging the front of his vehicle underneath the truck between its front and rear tires and thereby lifting the driver's side of the truck off the ground, and pinning the truck's passenger side against Terrasas's vehicle. *See* Dist. Op., ER-009. By this point, with the truck pinned between two police vehicles with two of its wheels lifted off the ground, a reasonable officer would have recognized — and a reasonable jury could conclude — that it was physically incapable of movement. Such an inference, which must be drawn in Williams's favor on summary judgment, receives further support from the fact that although the truck's engine was making noise after the truck was pinned between the two police vehicles, the truck remained entirely stationary and did not move in any direction even slightly. *See* Dist. Op., ER-015 (reviewing video evidence and concluding it does not "clearly show that Williams was . . . even moving the truck at all"). Accordingly,

Defendants' contention that the district court "*erroneously* 'assume[d] that Williams's truck was immobile and incapable of further flight,'" AOB at 39 (emphasis added), cannot be credited.

Moreover, moments after the truck became pinned between Janning's and Terrasas's vehicles, Gibson drove his own vehicle to a position just in front of the truck, further blocking the truck in. *See* Dist. Op., ER-009 (finding, upon review of the video evidence, that Williams was "now effectively boxed in by Janning, Gibson, and Terrasas"). Thus, even had the truck not already been immobilized, and had it still been capable of moving forward, it was now also physically blocked from doing so. On this basis, the district court correctly determined that a genuine factual dispute exists as to "whether Williams posed an immediate safety threat to the Officers and to others once the three Officers had boxed in his truck." ER-014. Video evidence also appears to show that Colborn parked his own vehicle directly behind the truck, such that the truck was also physically blocked at the rear. Viewing this evidence in the light most favorable to Williams and drawing reasonable inferences in his favor, the truck was tightly wedged between two vehicles, had two of its wheels lifted off the ground by the nose of one of those vehicles, and was physically blocked on all four sides by police vehicles — and thus was completely immobilized and posed no threat. *See Earl v. Campbell*, 859 F. App'x 73, 74-75 (9th Cir. 2021) ("[A]n officer should know that he can avoid

31

the danger of a stopped or non-accelerating car.") (citation and internal quotation marks omitted). And even if the truck could have moved, it could only have moved slowly due to the popped tire.

Further, the only officer Defendants have suggested was in any immediate danger just prior to or during any of the 30 shots was Gibson. *See* AOB at 17 (claiming "Plaintiff attempted to drive his vehicle into Officer Gibson's direction"), 33 (claiming "Plaintiff threatened *the officer* with a weapon – his truck") (emphasis added). Defendants have not argued that any other officer was in immediate danger. *See* AOB. However, the video evidence clearly shows that even had Williams's truck not been immobilized by Janning's and Terrasas's vehicles, and had Williams been able to pull forward, Gibson still would not have been in immediate danger. Gibson's own vehicle was blocking the front of the truck, and immediately upon exiting his vehicle Gibson retreated around the rear of his vehicle to the passenger side, such that after parking he remained either on the opposite side of his vehicle from the truck or in a position directly to the truck's left.[5] As the district court observed, "Gibson's body cam footage shows that he opened fire while walking behind and toward the back of his patrol vehicle, away

---

[5] That Gibson intentionally pulled forward and exited his vehicle in front of Williams's truck after the truck was pinned in place also creates an inference that Gibson himself recognized the truck had been immobilized, further supporting a finding that a reasonable officer would have recognized the same thing.

from the front of Williams's truck." ER-016. Gibson was not in the truck's potential path at any time when he fired. Although "[a] moving vehicle can of course pose a threat of serious physical harm," such a threat exists "only if someone is at risk of being struck." *Orn*, 949 F.3d at 1174; *see also id.* at 1174-75 (officer lacked objectively reasonable basis for using deadly force against driver where he "was never at risk of being struck by Orn's vehicle because he was never in the vehicle's path of travel"). Here, not only was Williams's vehicle immobilized and stationary, but even assuming it could have moved, there is at minimum a genuine dispute as to whether it could have posed any immediate risk of striking Gibson or anyone else, such as would have been necessary to justify the Officers' use of deadly force, because no one was at risk of being struck. *See id.*; *Estate of Najera-Aguirre*, 29 F.4th at 629.[6]

Even assuming *arguendo* that the officers reasonably believed the truck posed an immediate threat of death or serious bodily injury when they began

---

[6] Further, should the Court nevertheless credit Defendants' claim that Gibson was in the potential path of the truck and thus the truck posed a threat to him — a claim Williams disputes — it was Gibson himself who put himself in that position by pulling his vehicle up to the front of the truck and exiting, exposing himself to the alleged threat. However, this Court has repeatedly recognized that an officer cannot benefit from the fact that he "creates the very emergency he then resorts to deadly force to resolve." *Porter v. Osborn*, 546 F.3d 1131, 1141 (9th Cir. 2008); *see Nehad*, 929 F.3d at 1135 (citing *Torres*, 648 F.3d at 1126-27); *Winkler v. City of Phoenix*, 849 F. App'x 664, 666-67 (9th Cir. 2021).

shooting, the number and duration of the shots were nevertheless unreasonable.[7]

Officers are trained that they must justify every shot fired. Here, the truck was stopped, pinned between two patrol vehicles, and blocked in on all sides before the shooting began. There was no change in circumstances during the approximately 17 seconds from the time the truck was pinned in, the shooting occurred, and the shooting ended. The truck remained in its position, making noise before, during, and for approximately 51 seconds after the shooting. With the truck remaining stationary despite the noise, there was no reason for the officers to fire *30 shots* at Williams, over *14 seconds*, with a pause before the final three shots. *Cf. Plumhoff v. Rickard*, 572 U.S. 765, 777-78 (2014) (finding 15 shots fired in ten-second span reasonable because suspect never abandoned attempt to flee and was able to drive away after shots were fired, but acknowledging it "would be a different case if [the officers] had initiated a second round of shots after an initial round had . . . ended any threat of continued flight"); *see Zion v. Cnty. of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017) (holding that if jury were to find decedent no longer posed immediate threat between first and second round of shots, then officer would have been on notice that firing second round was unlawful); *Earl*, 859 F. App'x at 75

---

[7] Having determined that genuine factual disputes regarding the threat Williams posed precluded summary judgment as to any uses of deadly force, the district court "decline[d] to reach Williams's excessive force argument concerning the number of the Officers' lethal rounds." ER-017 n.13.

(distinguishing case involving continuous string of shots from "[c]ases where an officer shoots, pauses, and shoots again" because in such cases "the officer had time to assess whether the threat subsided"); *Lam v. City of Los Banos*, 976 F.3d 986, 1002 (9th Cir. 2020) (collecting cases establishing unconstitutionality of using deadly force after threat ends).

### 3. Williams Was Not Fleeing or Resisting When Deadly Force Was Used

While it is undisputed that Williams initially fled the officers, the district court correctly found that genuine factual disputes exist as to whether he was attempting to flee when the Officers fired, ER-014-016, and the video evidence makes clear that he was no longer fleeing and was incapable of flight immediately before and during the shooting, as discussed above. Given that Williams was inside his truck and not attempting to flee, he also was not resisting arrest. Accordingly, this factor weighs against the officers' use of deadly force. Moreover, even assuming *arguendo* that Williams was attempting to flee when the Officers fired, it could not justify the use of deadly force under these circumstances because Williams posed no immediate threat to anyone, and "[d]eadly force is not justified 'where the suspect poses no immediate threat to the officer and no threat to others.'" *Estate of Najera-Aguirre*, 29 F.4th at 629 (quoting *Garner*, 471 U.S. at 11) (alteration adopted).

### 4. The Officers Failed to Attempt to Use Other Feasible Alternatives Besides Deadly Force

"[P]olice are required to consider [w]hat other tactics if any were available, and if there were clear, reasonable and less intrusive alternatives to the force employed, that militate[s] against finding [the] use of force reasonable." *Glenn*, 673 F.3d at 876 (quoting *Bryan*, 603 F.3d at 831) (internal quotation marks omitted); *see Nehad*, 929 F.3d at 1138; *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005). Here, the officers had other reasonable options available when they used deadly force, including remaining in their vehicles until the truck's engine stopped making noise, warning Williams that they would use deadly force before shooting, giving Williams time to comply with such a warning and with their commands, and taking additional cover if necessary. Instead, the officers escalated the situation by firing at Williams and continuing to fire a total of 30 shots over 14 seconds.

### 5. The Officers Failed to Warn Williams that They Would Use Deadly Force

"Whether an officer warned a suspect that failure to comply with the officer's commands would result in the use of force is another relevant factor in the excessive force analysis." *Nehad*, 929 F.3d at 1137 (citing *Deorle*, 272 F.3d at 1284); *see Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1129 (9th Cir. 2021) ("A failure to warn before using deadly force could be unreasonable unless

impracticable."). Here, no officer provided Williams with any warning that they would use deadly force before firing, despite there being a 3-4–second gap from the time the truck became pinned between Janning's and Terreras's vehicles until the shooting began. Thus, the Officers had ample time to warn Williams that they would use deadly force before firing but failed to do so. Moreover, as the lack of any threat posed by Williams became even clearer as the Officers fired and the truck continued to remain stationary, the Officers had additional opportunities to pause and warn Williams that they would continue firing, but did not.

### 6. The Officers Were Not Entitled to Use Deadly Force Based on the Prior Chase or the Possibility Williams Might Flee

In seeking reversal, Defendants also rely on *Tennessee v. Garner*'s statement that "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." 471 U.S. at 11-12. Viewing the evidence in the light most favorable to Williams, this principle is inapplicable for several reasons.

First, Williams never threatened any officer with a weapon, including his truck. Although Williams bumped into some of the Officers' vehicles during the chase that preceded the shooting, this was unintentional and despite Williams's attempts to avoid hitting any police vehicles at any point. *See* ER-025. Defendants

37

also identify no point during the chase when any kind of standoff occurred — and none did — during which Williams reasonably appeared to be threatening to use his vehicle as a weapon against any officer. To the extent Defendants suggest such a threat occurred in the moments before the shooting, a reasonable officer could not have concluded the stationary and immobilized truck posed a threat. *See supra* Argument II.A.2.

Second, Defendants do not contend Williams committed any crime that inflicted serious physical harm on anybody, and he also did not commit any crime involving threatened infliction of such harm. Defendants cite various provisions of Nevada's battery statute in suggesting that Williams committed a battery using a deadly weapon when he bumped into officers' vehicles with his truck. *See* AOB at 28-29. As Defendants note, however, any battery must be "willful" under Nevada law, and as noted, Williams never intentionally struck any police vehicle with his truck; rather, he specifically attempted to avoid hitting any police vehicles. ER-025. Although Defendants rely on the Nevada Supreme Court's decision in *Gray v. State*, 130 Nev. 1182, 2014 WL 4922871 (2014) (unpublished table opinion),[8] in

---

[8] Unpublished Nevada Supreme Court decisions issued before 2016 may not be cited for persuasive value and are binding only in the case in which the decision was issued, in a related case, or for purposes of issue or claim preclusion. Nev. R. App. P. 36(c)(2)-(3). None apply here, making Defendants' citation to *Gray* improper. *See* Fed. R. App. P. 32.1(a)(i) (limiting courts' ability to restrict citation only of unpublished *federal* opinions).

suggesting that Williams used his vehicle to commit a battery with a deadly weapon — they do not make this argument directly, *see* AOB at 28-29 — *Gray* addressed whether the prosecution had presented sufficient evidence at trial that a criminal defendant intentionally drove his vehicle into an officer who was standing in the road. 2014 WL 4922871, at *1-2. Not only did Williams never strike any officer's person with his truck, but there is also no evidence he ever intentionally struck any officer's vehicle, and Williams submitted evidence showing he did not.[9]

Third, use of deadly force under this statement from *Garner* is justified only where "necessary to prevent escape." As explained, a reasonable officer would not have believed shooting Williams was necessary to prevent his escape, as it was readily apparent that his truck had been immobilized by police vehicles. Finally, *Garner*'s statement expressly limits the permissible use of deadly force to situations where "some warning has been given," "where feasible." 471 U.S. at 11-12. As explained, it was feasible for officers to provide Williams a warning they would shoot before firing, but they did not.[10]

---

[9] Defendants also cite Nevada's criminal "felony eluding" statute but make no argument as to either how it applies to Williams or, more importantly, how an alleged violation by Williams would constitute a "crime involving the infliction or threatened infliction of serious physical harm" to another, as would be necessary to justify the shooting under *Garner*. *See* AOB 29-30.

[10] Defendants also argue that because no underlying constitutional violation occurred, they are also entitled to summary judgment on Williams's *Monell* claims,

**B.**     **The Shooting Violated Clearly Established Law**

Qualified immunity's second prong addresses whether officials' conduct "violate[d] clearly established . . . constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 79 (2017) (citation omitted). The touchstone of the "clearly established" inquiry is whether "officers [had] fair notice of the illegality of their conduct" at the time. *Orn*, 949 F.3d at 1178 (citing *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018)); *see Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002). Although this ordinarily requires "cases relevant to the situation [officers] confronted," *Brosseau*, 543 U.S. at 200, it does "not require a case directly on point," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *see Hope*, 386 U.S. at 740 (qualified immunity should be denied even "despite notable factual distinctions between the precedents relied on and the [instant case], so long as the prior decisions gave reasonable warning that the conduct then at issue violated

_____

AOB at 42 n.12, and that they are entitled to summary judgment on Williams's battery claim because the standard for battery under Nevada law mirrors the federal excessive force standard, *id.* at 42-43 — arguments the district court also rejected, ER-021-022. Defendants do not offer other arguments regarding either claim. *See* AOB. Because genuine factual disputes regarding the alleged threat Williams posed and the consequent reasonableness of the shooting preclude summary judgment as to Williams's Fourth Amendment claim, this Court should affirm the district court's summary judgment denial as to the *Monell* and battery claims as well.

constitutional rights") (citation omitted). In considering existing precedent, the Court "may look at unpublished decisions and the law of other circuits, in addition to Ninth Circuit precedent." *Prison Legal News v. Lehman*, 397 F.3d 692, 702 (9th Cir. 2005).[11] In an "obvious case," however, even the more general standards set forth in *Graham* and *Garner* can "clearly establish" the unconstitutionality of official conduct "even without a body of relevant case law." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021) (quoting *Brousseau*, 543 U.S. at 199).

This Court's precedents show that, viewing the facts in the light most favorable to Williams and drawing all permissible inferences in his favor, as is required on summary judgment, the unconstitutionality of the Officers' uses of deadly force was clearly established at the time of the shooting. Specifically, as of May 5, 2020, it was clearly established that it is unreasonable and excessive to shoot someone who is being pursued under suspicion of a minor crime[12] and is in a stationary and immobilized vehicle that an objectively reasonable officer would not believe posed an imminent threat of death or serious bodily injury to anyone.

---

[11] Because this case is squarely governed by Ninth Circuit precedent, Defendants suggest that only Supreme Court precedent may clearly establish the law for qualified immunity purposes. AOB 30 & n.10. But the Supreme Court has never so held, *see id.* (collecting cases), and this Court has not recognized such a rule, *see Prison Legal News*, 397 F.3d at 702.

[12] *See supra* Argument II.A.1.

In *Acosta v. City and County of San Francisco*, an officer pursued two men believed to have stolen a purse who entered a stopped, already-running car. 83 F.3d 1143, 1144 (9th Cir. 1996), *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194 (2001). The officer "positioned himself facing the driver so that he was standing closer to the side than the dead-center of the car." *Id.* at 1146. While the car remained still or began moving slowly toward him, the officer fired two shots, killing the driver. *Id.* at 1144, 1146. This Court ruled the officer was not entitled to qualified immunity, because under such facts, "a reasonable officer . . . would have recognized that he could avoid being injured when the car moved slowly, by simply stepping to the side" and thus "could not have reasonably believed that shooting at the driver of the slowly moving car was lawful." *Id.* at 1146, 1148.

Similarly, in *Orn*, an officer attempted to pull over a driver, Orn, for driving at night without his headlights on. 949 F.3d at 1171. Orn did not pull over and instead drove home over the course of 15 minutes without speeding, and additional officers joined the pursuit. *See id.* at 1171-72. At various points during this chase, Orn drove onto a curb, down a closed roadway, and into a lane of oncoming traffic. *Id.* at 1172. As Orn arrived at a parking lot, officer Clark attempted to position his vehicle so as to block Orn's path before stepping out of the vehicle. *Id.* With his gun drawn, Clark repeatedly ordered Orn to stop. *Id.* Orn began to drive forward,

at a low speed and over a curb, to try to pass through a narrow gap between Clark's vehicle and a parked car, and another officer pulled forward toward Orn to try to block the gap. *Id.* at 1172-73. As Orn continued forward, he bumped into both officers' vehicles, at which point Clark approached from the passenger side of Orn's vehicle and fired three shots at Orn. *Id.* at 1173. Clark claimed that at the time, he had been standing directly behind his vehicle, and Orn had turned directly toward him and began accelerating toward him more quickly. *Id.* Orn then slumped over and his foot "floored the accelerator," and as the vehicle "sped away," Clark fired seven additional shots through Orn's rear windshield, later stating that he did so out of fear for the safety of his partner, "who he thought might be standing in the area where Orn's vehicle was headed." *Id.*

Taking the facts in the light most favorable to Orn, this Court held Clark lacked "an objectively reasonable basis for believing that Orn posed a threat of serious physical harm, either to Clark himself or to others." *Id.* at 1174. Noting that Clark's testimony regarding Orn steering toward Clark at the time Clark fired his first shots was disputed, the Court credited Orn's testimony, which "provide[d] an account of the shooting in which Clark was never at risk of being struck by Orn's vehicle." *Id.* at 1175. The Court further determined that even if a jury believed Clark's testimony, a jury could still conclude that Clark could have avoided being struck by stepping aside given Orn's low speed. *Id.* The Court also determined that

a jury could conclude Clark lacked a reasonable basis for believing Orn posed an immediate threat to Clark's partner, given that Orn had not previously driven toward officers and had been driving at low speeds. *Id.* at 1176. Based on these determinations and the Court's determination that Orn had not "driven in a manner that put[] the lives of pedestrians or other motorists at risk," the Court held that a jury could find that Clark's uses of deadly force violated the Fourth Amendment. *See id.* at 1175-77. The Court also denied qualified immunity, holding (1) that the unlawfulness of Clark's conduct was clearly established by precedent holding that "an officer lacks an objectively reasonable basis for believing that his own safety is at risk when firing into the side or rear of a vehicle moving away from him," and (2) that even if Clark's version of events could be credited, *Acosta* clearly established that use of deadly force against a slow-moving vehicle is unreasonable where an officer could have avoided any risk of injury by stepping out of the vehicle's path. *Id.* at 1178-79 (citing *Acosta*, 83 F.3d at 1146-47).

*Orn* and *Acosta* clearly established that where an individual is being pursued due to a minor offense, leads officers on a chase that does not reach high speeds or endanger members of the public, commits traffic violations in the course of that chase, bumps into officers' vehicles while attempting to avoid officers, and even begins driving slowly toward officers who are on foot and potentially vulnerable, using deadly force against him is excessive and unreasonable — even where the

44

officer has provided clear commands and time to comply with them. Indeed, *Orn* recognized that as early as October 2011, the unconstitutionality of using deadly force under such circumstances was already clearly established.

This case shares many of these pertinent details with *Orn*. Although here no Officer was in the truck's potential path when he fired, to the extent Gibson believed he was in in its potential path, he had the opportunity to simply "step . . . out of the [potential] path of [the] vehicle," and in fact did so prior to shooting, like in *Orn*. 949 F.3d at 1175. In other key respects, this shooting was even *more* clearly unconstitutional than in *Orn*. Unlike in *Orn*, officers either provided no commands or virtually no time to comply with commands they gave. Williams's truck was visibly immobilized and stationary, with a popped tire and no officer in its potential path, and there is no argument that the truck was moving in any direction immediately before or during any of the shots — demonstrating that there was no threat of death or serious bodily injury to anyone when the Officers fired. And the Officers here fired vastly more shots than did the officers in *Orn*, despite having ample opportunity to pause and reassess during the 14 seconds of shooting. *See* Dist. Op., ER-020 ("Like in *Orn*, Gibson—the Officer closest to the truck's front bumper—was not within the truck's direct path of travel; he quickly retreated toward the back of his patrol vehicle as he began shooting, away from the truck's front bumper. Thus, a reasonable juror could conclude that Gibson 'could not

45

reasonably have feared for his safety' when he opened fire while walking away

from a stationary truck.").[13]

---

[13] Other decisions by this Court and other federal appellate courts addressing similar scenarios also demonstrate that the unconstitutionality of using deadly force under these circumstances was clearly established. *See Adams*, 473 F.3d at 991-92, 994 (9th Cir. 2007) (holding that unconstitutionality of shooting at driver six times without warning, following chase during which suspect ran multiple stop signs and made a U-turn on the highway, after officers' "patrol cars completely surrounded the [vehicle], cutting off any possible avenue of escape" and when vehicle was not moving toward officer at time of shots, was "obvious" under *Garner* based on "the absence of warning and the lack of danger to the shooter or others"); *Jefferson v. Lias*, 21 F.4th 74, 81-83 (3d Cir. 2021) (surveying sister circuits and finding that a consensus of persuasive authority clearly established that, as of 2014, "a suspect fleeing in a vehicle, who has not otherwise displayed threatening behavior, has the constitutional right to be free from the use of deadly force when it is no longer reasonable for an officer to believe his or others' lives are in immediate peril from the suspect's flight"); *Williams v. Strickland*, 917 F.3d 763, 770 (4th Cir. 2019) (finding it clearly established as of 2005 that although "law enforcement officers may . . . be justified in using deadly force against the driver of a car when they are in the car's trajectory and have reason to believe that the driver will imminently and intentionally run over them, . . . the same officers violate the Fourth Amendment if they employ deadly force against the driver once they are no longer in the car's trajectory") (citing *Waterman v. Batton*, 393 F.3d 471 (4th Cir. 2005)); *Vann v. City of Southhaven*, 876 F.3d 133, 139 (5th Cir. 2017) (reiterating that "the Supreme Court has not declared open season on suspects fleeing in motor vehicles," and finding right clearly established where evidence supported inference that "absent a threat, [the officer] ran into the way of Vann's car and shot Vann to prevent him from successfully fleeing"); *see also Jefferson*, 21 F.4th at 82-83 (collecting additional relevant cases); *A.D. v. Cal. Hwy. Patrol*, 712 F.3d 446, 450-52, 454-55 (9th Cir. 2013) (holding that firing 12 shots at driver of suspected stolen car, who had been "traveling without headlights [at night] at high speeds, using all lanes of the freeway," who officers did not believe had a weapon in the car and who "rammed" into police cars multiple times while yelling "[f]uck you" to officers, was "obvious[ly]" unconstitutional even under heightened Fourteenth Amendment purpose-to-harm standard, where the "car was contained in a dead-end street," "the officers were positioned such that

Although it was decided after the events in this case and thus cannot itself clearly establish the law, this Court's decision in *Villanueva v. California*, 986 F.3d 1158, 1171 (9th Cir. 2021), further confirms that the law governing officers' use of deadly force under these circumstances was clearly established by the date of this shooting.[14] Like *Orn*, *Villanueva* involved a vehicle pursuit that was initiated based on a minor offense, but the *Villanueva* suspect's vehicle was "going between 50 and 70 miles per hour on surface streets and running at least three red lights." *Id.* at 1162-63. The pursuit in *Villanueva* reached a dead end, at which point the suspect turned his vehicle around to face officers who were standing outside of their vehicles approximately 15-20 feet away, and the officers opened fire on the vehicle while it was stationary or moving forward slowly, and while or shortly after the officers shouted a warning. *Id.* at 1163-64.

---

they were not in the [car's] path," and the "car was either stopped or going forward at the time of the shooting").

[14] *Villanueva* was decided in 2021 but concerned a shooting that occurred in July of 2016, *id.* at 1162, years before this incident. "When a case involves analogous conduct that occurred around the same time as the underlying incident in the matter before [the Court], and the case holds that the conduct at issue there violated clearly established law, then that case may indicate that the claim for qualified immunity presently before [the Court] should likewise be rejected." *Lam*, 976 F.3d at 1001-02 (citing *Curnow ex rel. Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 & n.*** (9th Cir. 1991)); *see Holloway v. Horn*, 2021 WL 3929972, at *2 (9th Cir. Sept. 2, 2021) (same) (quoting *Lam*, 976 F.3d at 1001-02); *Curnow*, 952 F.2d at 325 & n.*** (same).

Noting that the suspect's vehicle "was moving very slowly . . . when the Officers began shooting," the *Villanueva* Court held that "a reasonable jury could conclude that the Officers used excessive force, because they 'lacked an objectively reasonable basis to fear for their own safety, as they could simply have stepped back or to the side to avoid being injured.'" *Id.* at 1171 (cleaned up) (quoting *Orn*, 949 F.3d at 1179). The Court further held that the unconstitutionality of the officers' use of deadly force was clearly established by *Acosta* and *Orn*, noting that in both cases, the suspect's "vehicle was at a stop shortly before the shooting," "no officer was standing directly in front of the vehicle," and the suspect "did not accelerate toward the police car or the Officers before the Officers opened fire." *See id.* at 1171-72. Importantly here, the fact that *Villanueva*'s shooting was preceded by a chase in which the suspect reached speeds of up to 70 MPH on surface streets (here, Williams's maximum speed was 66 MPH, on the freeway) and ran three red lights did not render the shooting objectively reasonable, nor did it mean the unconstitutionality of the shooting was not clearly established.[15]

---

[15] In the Ninth Circuit, the standards to which officers are trained "are also relevant, although not dispositive, to determining whether reasonable officers would have been on notice that their conduct was unreasonable." *Vazquez*, 949 F.3d at 1165-66 (citing *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003)). Here, police practices expert Roger A. Clark opined that the Officers' conduct violated standard police practices and training, SER-34,

Defendants' efforts to distinguish *Acosta* and *Orn*, and their suggestion that these cases did not clearly establish the law, impermissibly rely on Defendants' own self-serving versions of the facts, which are genuinely disputed. For example, Defendants attempt to distinguish *Acosta* on the basis that Williams, unlike the suspect in *Acosta*, "drove on the wrong side of the freeway" and had "the truck . . . in close proximity to and facing a police officer" at the time of the shooting. AOB at 37. However, Williams disputes these contentions, which are not established by the video evidence. *See also id.* at 38 (again attempting to distinguish based on claim that Williams was "attempting to accelerate his vehicle towards officers who [were] outside their vehicles within close proximity of Plaintiff's vehicle," despite dispute regarding whether Williams was attempting to accelerate, and no evidence he attempted to do so "towards officers" when no one was in front of his vehicle).

Also contrary to Defendants' arguments, *Plumhoff v. Rickard*, 572 U.S. 765 (2014), does not show that Williams's right was not clearly established. *Plumhoff* addressed a shooting that followed a vehicle chase that "exceeded 100 miles per hour," during which the suspect "swerv[ed] through traffic at high speeds" and "passed more than two dozen other vehicles, several of which were forced to alter course." *Id.* at 769, 776. After the front of the suspect's vehicle made contact with

_____

further demonstrating that the Officers had fair notice that using deadly force was unlawful under these circumstances.

a police vehicle, the suspect's vehicle "was rocking back and forth" as the suspect attempted to accelerate. *Id.* at 770. As the officers then began to fire at the suspect, the suspect "never abandoned his attempt to flee" and "reversed in a 180 degree arc and maneuvered onto another street" before officers fired a second round of shots. *Id.* at 770, 777. "Less than three seconds" had passed between the time the suspect's vehicle stopped and the time he began driving away. *Id.* at 776.

In deeming the officers' use of deadly force reasonable, the *Plumhoff* Court expressly relied on the fact that the suspect "resumed maneuvering his car" immediately before the initial shots were fired. *Id.* It further relied on the fact that not only was the suspect clearly attempting to drive away, but also that there were objective indicia observed by the officers that the vehicle was *actually capable* of driving away, in that the vehicle was moving back and forth and that during the shooting, the suspect in fact put his car in reverse and started to drive away, "conclusively disprov[ing] [the plaintiff's] claim that the chase . . . was over when [the officers] began shooting." *Id.* at 776-77.

Crucially, here the video evidence shows that Williams's truck was entirely stationary for 3-4 seconds from the time it became pinned between the police vehicles until the shots began, for the full 14 seconds when shots were fired, and thereafter. It further shows that the truck was tightly pinned between two police vehicles with one of those vehicles wedged underneath the truck, lifting one side of

the truck off the ground, such that it was clear that the truck was immobilized —

further evident in that the truck was not moving despite the loud sound coming

from its engine.[16] Further still, the evidence shows the truck was also blocked by

additional vehicles at the front and rear, such that even if the truck *could* have

driven forward or backward (it could not), and even if Williams *was* visibly

attempting to drive away (he was not), the truck was still effectively immobilized

because it would still have been physically stopped before it could come into

contact with anyone. The truck also had a popped tire, such that any hypothetical

escape could only have occurred at a low speed. And while Williams did attempt to

evade officers before the shooting, the chase never reached high speeds or

impacted the safety of other drivers on the road, making this a far cry from

*Plumhoff*, where the Court found that the suspect's "outrageously reckless driving

posed a grave public safety risk." *Id.* at 776. These are critical distinctions — in

*Plumhoff* the officers had an objective basis for believing both that the suspect

could have resumed his flight at any time (and indeed he did) and would have

---

[16] *See* Dist. Op., ER-019 ("Unlike in *Plumhoff*, (resolving factual disputes in Williams's favor) Williams . . . did [not] 'throw his car into reverse in an attempt to escape' after Gibson, Janning, and Terrasas pinned in and immobilized him. Moreover, it is far from clear whether Williams 'never abandoned his attempt to flee' during the 15-second timeframe in which the Officers fired their dozens of rounds.") (quoting *Plumhoff*, 572 U.S. at 776-77) (alteration adopted, other citations omitted).

endangered the public had the chase continued, but here the officers had no objective basis to support such beliefs. Because these key details upon which *Plumhoff* relied are wholly absent from this case, *Plumhoff* does not undermine the conclusion that *Acosta* and *Orn* clearly established the unconstitutionality of this shooting.

Defendants also claim that this case is like *Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010), in that the truck's tires "could have gained traction at any time, resulting in a sudden acceleration in speed." AOB at 39 (quoting *Wilkinson*, 610 F.3d at 552). However, there is no support for this assertion in the evidence: The videos show the truck tightly pinned between two police vehicles, with the driver's side wheels lifted well off the ground. This case also bears little other resemblance to *Wilkinson*, where officers faced a vehicle that was moving toward them on a slippery, muddy lawn, with the engine revving and no obstacles between it and the officers (or other visible impediments to its movement), such that the officers had genuine reason to believe it could have suddenly accelerated toward them at any time, and where the shooting officer reasonably believed his partner *had already been run over* and was about to be again. *See Wilkinson*, 610 F.3d at 549, 551-53; *see also Villanueva*, 986 F.3d at 1172 (rejecting similar comparison to *Wilkinson*); Dist. Op., ER-015 (same).

Accordingly, the unconstitutionality of this shooting was clearly established by existing precedent. But even absent similar precedent, viewing the facts in Williams's favor, the shooting's unconstitutionality would have been obvious to a reasonable officer, given the readily apparent fact that Williams's truck was entirely immobilized and stationary for 3-4 seconds before the shooting and during the 14 seconds of shooting, and did not move again. As this Court has explained:

> [I]n an "obvious case," the standards set forth in *Graham* and *Garner* . . . can "clearly establish" that a constitutional violation has occurred "even without a body of relevant case law." *Rivas-Villegas*, 142 S. Ct. at 8. . . . . Deadly force is not justified "where the suspect poses no immediate threat to the officer and no threat to others." *Garner*, 471 U.S. at 11. Assuming that [the suspect] posed no immediate threat to [officers] or others at the time of his death, this "general constitutional rule" applies "with obvious clarity" [ ] and renders [the officer]'s decision to shoot [the suspect] objectively unreasonable.

*Estate of Najera-Aguirre*, 29 F.4th at 629 (cleaned up). Here, viewing the facts in the light most favorable to Williams, Williams posed no immediate threat whatsoever to anyone at the time officers fired from positions of cover and safety, when the Officers could see that his vehicle was not moving and could not move because it had been pinned in place and blocked on all sides by police vehicles, with a popped tire. Under such circumstances, *Garner*'s rule that "[w]here the suspect poses no immediate threat to the officer and no threat to others," the use of deadly force is "constitutionally unreasonable," 471 U.S. at 11, "appl[ies] with obvious clarity to the specific conduct" in this case, *Hope*, 536 U.S. at 741. Thus,

both under this Court's precedents and because the constitutional violation in this case was obvious, the unlawfulness of the shooting was clearly established at the time, and the Officers are not entitled to qualified immunity.

### C.     The Officers' Use of 40mm Rounds Was Excessive, and Its Unconstitutionality Was Clearly Established

Firing two 40mm rounds at Williams after the shooting, when Williams still posed no threat to officers, was also excessive. Defendants' argument that this force was permissible because the Officers were not "attempting to hit" Williams, AOB at 41, fails, as force constitutes a seizure so long as the act of using force is volitional and restrains the subject's liberty; the Officers' subjective intentions regarding the object of that force are irrelevant. *Nelson v. City of Davis*, 685 F.3d 867, 876-77 (9th Cir. 2012); *see id.* (collecting cases); *Villanueva*, 986 F.3d at 1166-69. This principle was clearly established well in advance of this incident, *id.* at 1168-69 (citing *Nelson*, 685 F.3d at 884), as was the unconstitutionality of using less-lethal rounds against nonthreatening and nonresistant suspects, *see Nelson*, 685 F.3d at 885-86 (citing *Deorle*, 272 F.3d at 1284-86 & n.23). Intentionally firing the 40mm and striking Williams constituted excessive force, *see id.* at 883 (use of less-lethal rounds on nonthreatening, nonresistant individuals is excessive), and the Officers are not entitled to qualified immunity.

# CONCLUSION

For the foregoing reasons, the Court should dismiss this interlocutory appeal

for lack of jurisdiction. If the Court reaches the merits, it should affirm the district

court in all respects.


Respectfully submitted,


DATED:  November 6, 2023        LAW OFFICES OF DALE K. GALIPO


By */s/ Benjamin S. Levine*
Dale K. Galipo
Benjamin S. Levine
Attorneys for Plaintiff-Appellee

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 23-15465

I am the attorney or self-represented party.

**This brief contains** | 13,990 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

   ○ it is a joint brief submitted by separately represented parties;
   ○ a party or parties are filing a single brief in response to multiple briefs; or
   ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Benjamin S. Levine | **Date** | Nov 6, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**       56       *Rev. 12/01/2018*